IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BOBBY WAYNE SAVAGE                                                              PLAINTIFF

v.                    Civil No. 05-5037

SHERIFF KEITH FERGUSON; and
OFFICER SCOTT TURNER                                                          DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Bobby Wayne Savage brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. While he was incarcerated at the Benton County Detention Center, Savage contends his federal constitutional rights were violated when excessive force was used against him on July 1, 2004.

On December 27, 2005, defendants filed a motion for summary judgment (Doc. 33). On February 7, 2006, the undersigned entered an order (Doc. 36) directing the plaintiff to complete, sign and return an attached questionnaire that would serve as his response to the motion for summary judgment. On March 10, 2006, plaintiff was given an extension of time to complete the questionnaire. (Doc. 40). On April 6, 2006, plaintiff's response to the court's questionnaire (Doc. 41) was filed. The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motion.

### I. BACKGROUND

On November 20, 2003, Savage was given a restricted medical classification at the Arkansas Department of Correction (ADC). *Plaintiff's Response* (Doc. 41) (hereinafter *Resp.*) at ¶ 2. Among other things, his job assignments were to be restricted to assignments not

-1-

AO72A
(Rev. 8/82)

requiring handling or lifting of heavy materials in excess of ten pounds or requiring overhead work for a period of time in excess of four hours. *Id.* at ¶ 2.

Note was made of the fact that Savage was to be given one arm duty with his left arm because he had difficulty raising his right arm secondary to a shoulder deformity. *Resp.* at ¶ 3. He underwent a health examination at the ADC on November 20, 2003, and reported a history of bi-polar disorder, chronic low back pain secondary to a motor vehicle accident a few years ago, right knee and left hip with dislocated clavicle. *Id.* at ¶ 4.

On December 15, 2003, Savage was involved in an altercation in the Benton County Detention Center (BCDC). *Resp.* at ¶ 5. Following the altercation, Savage was taken to the nurse by the guards and the nurse noted a large knot on top of his right shoulder and scheduled him to see the doctor. *Resp.* at ¶ 6. On December 15, 2003, Savage's right shoulder was x-rayed at Northwest Medical Center of Benton County. *Defendants' Exhibit* 3 (hereinafter *Defts' Ex.*) at pages 2 & 4. The radiologist noted a "grade 3 separation of the acromioclavicular joint. Heterotopic bone projects over the inferior margin of the distal clavicle. This raises the possibility that the separation is old." *Id.* at page 4. The injury was described as possibly chronic. *Id.*

On June 25, 2004, Savage was booked into the Benton County Detention Center (BCDC) from the Varner Unit of the ADC for court appearances. *Defts' Ex.* 2 at page 3. When he was booked in on June 25, 2004, Savage completed a medical questionnaire on which he reported hip and back problems. *Id.* at page 4. He also completed a medical request form on which he stated he fell down the steps at prison and hurt his back and hip and had been placed on a two week lay in for bed rest. *Id.* at page 5.

AO72A
(Rev. 8/82)

On June 28, 2004, Deputy McPherson saw Savage lying on his bunk and did a shake down of his cell. *Defts' Ex.* 2 at page 8. McPherson found extra towels in his cell. *Id.*

On June 28, 2004, at approximately 1045 Savage flooded his cell and the day-room in D-pod. *Defts' Ex.* 2 at page 8. Savage admitted to flooding his cell and was disciplined. *Id.* at page 9. He received thirty days lock down and loss of privileges. *Id.*[1]

Savage was seen by Dr. Neil Mullins on Monday, June 28, 2004. *Defts' Ex.* 2 at page 10. He told Dr. Mullins he fell in the shower the prior Wednesday. *Id.* Dr. Mullins noted that Savage's complaints were far out of proportion to his history and Dr. Mullins believed Savage was tremendously exaggerating his symptoms. *Id.* Dr. Mullins gave Savage an injection of Decadron and prescribed Ibuprofen, 600 mg., three times a day, for five days. *Id.*

According to Savage, Dr. Mullins is a "horse doctor and will say anything Benton Co. Sheriff['s] Office wants him to say." *Resp.* at ¶ 16. Furthermore, if he was exaggerating, Savage questions why Dr. Mullins would have prescribed an injection and medication for him. *Id.* at ¶ 17.

On June 30, 2004, Deputy Jonathan Hall heard someone screaming at pod control. *Resp.* at ¶ 18. He stopped feeding the inmates in D-130 and locked all inmates in the day-room back in their cells. *Id.* According to Hall, when he got to pod control he saw Savage pushing Deputy Davis. *Defts' Ex.* 2 at page 11.

Davis told Savage to stop and put his hand behind his back. *Defts' Ex.* 2 at page 11. According to Davis, Savage refused telling Davis: "F— you, f------ don't touch me b---- I will kick you're a--." *Id.* Davis maintains Savage then pushed him again. *Id.*

---

[1] Savage maintains these activities have nothing to do with this case. *See Resp.* at ¶¶ 11-14.

-3-

Deputy Hall then placed Savage on the floor. *Defts' Ex.* 2 at page 11. According to defendants, Savage put his left hand under his head and Hall grabbed Savage's right hand and put it behind his back. *Id.* Defendants maintain Savage attempted to bite Davis' hand. *Id.* When Hall tried to grab Savage's left hand, he also tried to bite Hall. *Id.* Hall used a pressure point under Savage's nose to free his hand. *Id.* Davis then got Savage's left hand and placed it behind Savage's back. *Id.* Deputy Plotz put handcuffs on Savage. *Id.*

Savage was stood up and Plotz escorted Savage to lock-down. *Resp.* at ¶ 26. On June 30, 2004, Savage submitted a grievance. *Defts' Ex.* 2 at page 12; *Resp.* at ¶ 27. In it Savage stated that while he was being escorted to B-pod from D-149 by Plotz they met Davis in the hall and Savage told Davis that Savage wouldn't always be locked up. *Id.* Savage stated he spit at Davis. *Id.*

According to defendants, Savage spit on Davis a second time. *Defts' Ex.* 2 at page 19. Davis then put Savage against the wall and attempted to put him in a submission hold. *Id.* Savage maintained Davis attempted to choke him and demanded that pictures be taken of his neck. *Resp.* at ¶ 30.

As a result of the incident, Savage was charged with threatening another person, refusing to obey orders of jail staff, using obscene language toward jail staff, and assaulting jail staff. *Defts' Ex.* 2 at page 20. Savage was found guilty of the disciplinary violations and given thirty days lock-down and loss of privileges. *Resp.* at ¶ 33.

According to defendants, Savage admitted to spitting on Davis, cursing him, and telling him that he wouldn't be in prison forever. *Id.* However, Savage stated he was not a threat because all the other inmates were locked down. *Id.*

AO72A
(Rev. 8/82)

Savage, however, states he pushed no one. *Resp.* at ¶ 19. Moreover, he contends this was an act of retaliation on Davis' part. *Id.* at ¶ 21. As a result of the incident, criminal charges were also brought against Savage for aggravated assault upon an employee of a correctional facility. *Resp.* at ¶ 34. Savage pled guilty to the charge and was sentenced to six years in prison. *Id.* at ¶ 35. Savage maintains this incident has nothing to do with this case. *Id.* at ¶¶ 19, 22, 27.

On July 1, 2004, Savage had been to court and Deputy Turner brought Savage and the other inmates back to the BCDC. *Resp.* at ¶ 36. According to Turner, Savage used the restroom in the intake area without permission and leaned against the wall. *Defts' Ex.* 2 at page 24. Specifically, Turner's incident report provides as follows:

> I Deputy Turner, was returning the inmates from court. Inmate, Savage, Bobby was among this group. He came out of a restroom in the intake area without asking for permission. From the booking area Major Drake saw that and him then leaning on the wall, which is against jail policy. The Major ordered him to get off the wall. Inmate Savage stated he wasn't on it. I saw that he was and told him to move away. Major Drake came out to the intake area and explained to him the rules that no inmate is to use that restroom or lean on the wall. After Major Drake left inmate Savage he kept mouthing loudly that he wasn't doing anything wrong. I told inmate Savage, "Shut the F— Up." He said, "F— You, Mother F-----." I approached Savage, he had both fists in a closed fighting position by his side. I grabbed him by the shirt by both shoulders and put him up against the nearest wall. He kept calling me a Motherf-----, and then I put him to the ground stomach first. I put both hands behind his back. I was ordered to take him into the booking area and put him into a holding cell. I did that without any further incident. After he was put in the holding cell he banged on the door and was yelling obcenities, "Turner you punk a-- mother f------ b-----." I continued on with my duties without any further incident.

*Defts' Ex.* 2 at page 24.

Savage maintains he never used the restroom. *Resp.* at ¶ 37. Instead, he states it was another inmate. *Id.* He also maintains he was never leaning against the wall. *Id.* Savage maintains Drake never said anything to him. *Resp.* at ¶ 39 & ¶ 42. Savage asserts Turner was

-5-

mad and abusing his power because he had been reprimanded by his superior. *Id.* at ¶ 37 & ¶ 41. Savage indicates he told Turner that if he cursed Savage he had the right to curse Turner back. *Id.* at ¶ 45. Savage also indicates he stated that he had the right to freedom of speech. *Id.* at ¶ 47.

According to Savage, Turner jerked Savage out of line, slammed him against the wall, pushed him backwards over a table, slammed him on the ground, and jerked his arms behind his back. *Resp.* at ¶¶ 48, 50, 51(A), 51(C), & 51(D). When Savage complained that it was police brutality, he states Drake told Turner to let him up. *Id.* at ¶ 51(B). Instead, Savage maintains Turner jerked Savage's arms higher behind his back until it felt like his arms were being broken. *Id.* at ¶ 51(B). When Savage complained that Turner was breaking his arm, Savage asserts Turner merely picked Savage's arms up higher and replied: "Oh yeah, I'm breaking your arm." *Id.* Savage states this action caused his right shoulder to completely separate. *Id.*

Savage asserts that he suffered a great deal of pain and suffering as a result of the shoulder separation. *Resp.* at ¶ 51(E). He maintains he still has problems with his shoulder and needs surgery to correct the problem. *Id.*

Turner did not know Savage had previously injured his shoulder. *Resp.* at ¶ 51(F). At the time, Savage did not tell Turner about his prior shoulder injury or complain of any pain. *Id.* at ¶ 51(G).

Following the incident, Savage was placed in a holding cell. *Resp.* at ¶ 53. Savage banged on the door to the cell. *Id.* at ¶ 54. He asked for medical attention for his arm. *Id.* at ¶ 55.

Savage was seen in the jail clinic and then sent to the emergency room of Northwest Medical Center of Benton County. *Resp.* at ¶ 56. The radiologist reported a complete dislocation of the acromioclavicular joint which by history was acute. *Id.* at ¶ 57. Ossific or calcific densities were noted suggesting there was an old injury as well. *Id.* No evidence of a fracture or destructive lesion was found. *Id.*

Savage's arm was placed in an immobilizer and he was prescribed pain medication. *Resp.* at ¶ 58. Savage was seen by Dr. Mullins at the BCDC on July 6, 2004, for follow up care. *Defts' Ex.* 2 at page 39. Dr. Mullins noted Savage had a dislocated right shoulder. *Resp.* at ¶ 60. Dr. Mullins prescribed pain medication to be taken up to three times a day and a blanket as needed for warmth. *Id.* at ¶ 61.

Dr. Mullins indicated he would follow up with the ADC to see if Savage should be sent to an orthopedic specialist or if the ADC would rather wait until he got back to prison. *Defts' Ex.* 2 at page 39. Savage was released to the ADC on July 9, 2004. *Id.* at ¶ 63.

Sheriff Ferguson was not present on July 1, 2004, when the incident occurred between Savage and Turner. *Resp.* at ¶ 69(A). Savage never communicated directly with Sheriff Ferguson about the incident. *Id.* at ¶ 69(B). Savage maintains Sheriff Ferguson violated his rights by failing to train and maintain his officer in an orderly manner and control him. *Id.* at ¶ 69(C). Savage states he wrote Sheriff Ferguson several grievances about the abuse and the sheriff never did anything to investigate. *Id.*

When Savage returned to the ADC, he was seen by medical staff and he was told to keep his arm in a sling for three weeks and then start gentle range of motion exercises. *Resp.* at ¶ 64.

AO72A
(Rev. 8/82)

He was given pain medication. *Id.* Savage indicates he was also referred to an orthopedic doctor and told he would need corrective surgery. *Id.*

Note was made that Savage's right shoulder was dropped and when he moved it the least there was an obvious separation. *Resp.* at ¶ 65. On July 21, 2004, Savage was seen in the orthopedic clinic of the ADC. *Id.* at ¶ 66. A new x-ray was ordered and he was to have no use of his right hand. *Id.* Savage was given no duty requiring the use of his right arm or hand from August 5, 2004, through December 5, 2004. *Id.* at ¶ 67.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

AO72A
(Rev. 8/82)

## III. DISCUSSION

Defendants have now moved for summary judgment. First, defendants contend the force used was justified and not excessive. Second, Turner contends he is entitled to qualified immunity. Third, they contend there is simply no basis on which Sheriff Ferguson can be held liable.

"The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that 'arise[] in the context of an arrest or investigatory stop of a free citizen,' while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Wilson v. Spain*, 209 F.3d 713 (8th Cir. 2000)(*citing Whitley v. Albers*, 475 U.S. 312, 318-322, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). In this case, Savage was serving a term of imprisonment when the incident at issue occurred. *Resp.* at ¶ 1. The Eighth Amendment will, therefore, be used to analyze his claim.

"The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002)(citations omitted). The Supreme Court has held that when "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones*

*v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (*quoting Hudson*, 503 U.S. at 6-7). To make this determination, the court is to consider, among other things, the following factors: "the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate." *Jones*, 207 F.3d at 495 (citations omitted).

It has been said that "[n]ot every malevolent touch by a prison guard gives rise to a federal cause of action" because the "prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* (citations and internal quotation marks omitted). While "[s]erious or permanent injury is not required to make out an Eighth Amendment claim, [s]ome actual injury must be shown." *Id.* (citations omitted). Additionally, the court considers "the extent of the pain inflicted in order to determine whether a constitutional deprivation has occurred." *Id.* (citations omitted).

Defendants contend painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal. Defendants maintain it was only Savage's pre-existing injury that made what would otherwise be a common non-excessive handcuffing technique a maneuver that caused injury in this case. Defendants rely on *Rodriquez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002).

In *Rodriquez*, the plaintiff maintained excessive force was used during his arrest. *Id.* at 1351. As summarized by the court: "The evidence, viewed in the light most favorable to plaintiff, shows Sgt. Farrell grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that

-10-

Farrell was hurting him. Plaintiff was placed in the rear of Sgt. Farrell's patrol car, kept handcuffed behind his back and transported to the police station." *Id.*

The handcuffing caused the loosening of internal surgical hardware and the displacement of a key bone fragment. *Id.* "[R]esulting complications included more than twenty-five subsequent surguries and ultimately amputation of the arm below the elbow." *Id.*

The court stated that:

> Rodriguez's earlier surgery made what otherwise would be a common non-excessive handcuffing technique (that ordinarily would be painful but cause minimal injury) a maneuver that caused severe injury and tragic results. This distinction, however, is not important legally and does not preclude a conclusion that Rodriguez has shown no constitutional violation: no evidence has been presented that Sgt. Farrell knew of plaintiff's recent elbow surgery or, more important, knew that handcuffing plaintiff would seriously aggravate plaintiff's preexisting condition. We do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act. What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time. Under the circumstances of this case, Sgt. Farrell's acts cannot rise to the level of a constitutional violation.

*Id.* at 1352-1353 (citation and footnotes omitted).

Defendants maintain Turner used a minimal amount of force to remove Savage from the area. *Defts' Brief* (Doc. 34) at page 7. Defendants argue Turner grabbed Savage by the shoulders put him against the wall, put him on the floor stomach first, put his hands behind his back and then put him in the holding cell. *Id.* Other than the act of handcuffing, defendants maintain there is no evidence of any use of force. *Id.*

AO72A
(Rev. 8/82)

We note that nothing in Turner's report indicates he placed handcuffs on Savage. *See Defts' Ex.* 2 at page 24. Moreover, Savage denies that handcuffs were placed on him. *Resp.* at ¶ 51(B).

To conclude that the only use of force was handcuffing, contradicts the facts as set forth by Turner himself. Obviously, force was used to place Savage against the wall and on the floor. While the force used may not have been excessive, there was physical force used. To conclude the force used was not excessive given the contradictory versions of the events of that day offered by Turner and Savage would require the court to adopt Turner's version of the day's events over those advanced by Savage. The court has been provided with no other statements from officers or witnesses. Nothing was submitted to the court indicating Savage was charged with a disciplinary violation or found guilty of having violated the rules of the facility in connection with this incident.

With respect to the injuries, there is clear evidence establishing Savage sustained injuries and sought, and received, medical care for those injuries. At the summary judgment stage, we are not free to make credibility determinations and adopt one version of facts over another. Instead, we must view the evidence in the light most favorable to the plaintiff. We therefore cannot say as a matter of law that no excessive force was used against Savage.

Next, Turner argues he is entitled to qualified immunity. "Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Carroll v. Pfeffer*, 262 F.3d 847, 849 (8th Cir. 2001)(*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "The qualified immunity standard

'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991)(*quoting, Malley v. Briggs*, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). The inquiry is normally one of pure law. *J.H.H. v. O'Hara*, 878 F.2d 240 (8th Cir. 1989).

"The determination of whether a state actor is entitled to the protection of qualified immunity is a two-step process." *Washington v. Normandy Fire Protection Dist.*, 272 F.3d 522, 526 (8th Cir. 2001). First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, the court must determine if the right was clearly established. *Washington*, 272 F.3d at 256.

"[T]here is no question that [the] right to be free from excessive force" is clearly established. *Wilson*, 209 F.3d at 716. *See also McGruder v. Heagwood*, 197 F.3d 918 (8th Cir. 1999). Viewed in the light most favorable to Savage, the evidence does not show an objective need for the force that was used because Savage was not jeopardizing any person's safety and was not threatening the security of the facility. *Treats*, 308 F.3d at 872. "The law recognizes that order and discipline are important in running a correctional institution, but that does not authorize the arbitrary use of force, nor does it justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns." *Id.* (citations omitted). Turner's "arguments asserting qualified immunity rest largely on ignoring disputed facts in the record and asking this court to resolve factual disputes in [his] favor." *Wilson v. Lawrence*

*County*, 260 F.3d 946, 951 (8th Cir. 2001). The court is not free to chose to believe Turner's version of the events, and disbelieve or ignore Savage's version of the events. On the record before the court, we find Turner not entitled to qualified immunity.

Finally, defendants contend there is simply no basis on which Sheriff Ferguson can be held liable. We agree. We find there is no genuine issue of material fact as to whether Sheriff Ferguson can be held liable for any alleged constitutional violation.

A supervisor may not be held liable for a section 1983 violation on the basis of *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Savage does not contend Sheriff Ferguson directly participated in the alleged constitutional violations or that a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights. *Resp.* at ¶ 69(A) & 69(B). *See Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996) (*citing Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir.1994)); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility). Further, the record in this case is devoid of any suggestion of the existence of a custom or policy on which to hold Benton County liable. In short, there is nothing to suggest Savage's alleged constitutional deprivation was caused by a custom or policy of Benton County.

### IV. CONCLUSION

I therefore recommend that the defendants' motion for summary judgment be granted in part and denied in part. Specifically, I recommend: (1) the motion be granted as to the claims against Sheriff Keith Ferguson and that he be dismissed from this lawsuit; and (2) that the motion be denied as to the claims against Officer Scott Turner.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 7th day of June 2006.

                                                /s/ Beverly Stites Jones
                                                UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)