IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BOBBY WAYNE SAVAGE                                                    PLAINTIFF

           v.                           Civil No. 05-5037

OFFICER SCOTT TURNER                                                  DEFENDANT

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Before the undersigned for report and recommendation is the civil rights complaint filed by Bobby Wayne Savage, currently an inmate of the Arkansas Department of Correction. Savage proceeds pro se and *in forma pauperis*.

While detained at the Benton County Detention Center (BCDC), Savage contends his constitutional rights were violated on July 1, 2004, when Officer Scott Turner used excessive force against him. An evidentiary hearing was conducted on October 24, 2006.

At the conclusion of the hearing, plaintiff asked the court to obtain the medical records of Dr. John Lytle. These records were obtained by the issuance of a subpoena pursuant to Rule 45 of the Federal Rules of Civil Procedure. Once received by the court, both parties were provided copies of the records and notified that the records would be considered part of the evidence offered by the plaintiff. The matter is currently before the undersigned for preparation of this report and recommendation.

## I. BACKGROUND and EVIDENCE PRESENTED

At the evidentiary hearing, the court heard the testimony of a number of witnesses. For purposes of discussion, the court will summarize in the first person the testimony given.

-1-

*Bobby Wayne Savage*

I'm forty years old. I'm an inmate in the Arkansas Department of Corrections (ADC).

On July 1, 2004, I was in the Benton County Detention Center (BCDC). Officer Scott Turner used excessive force against me.

I had been back and forth a number of times during 2004 from the ADC to the BCDC for court. I can't remember the exact dates.

I was in the ADC on a parole violation in 2004. I came back to the BCDC for court on a pending charge in Benton County.

In November of 2003, at the ADC, I was put on a restricted medical class because of problems with my back, ankles, and hips. I had a lifting restriction of five, ten, or twenty pounds. I had a motorcycle wreck a long time ago.

I had right arm restrictions at the ADC because of my shoulder and wrist. I cut my wrist a bunch of times. I had dislocated my right shoulder. I don't know how it happened. I hadn't had any problems with my left arm.

On December 15, 2003, I had an altercation with an inmate. I had a knot on the top of my right shoulder. I don't think I was in the BCDC at that time.

On June 25, 2004, I reported having back and hip problems. On June 28, 2004, I told Dr. Mullins I fell in the shower at the ADC and was put on two weeks bed rest. All they do at the BCDC is give you Ibuprofen.

On June 30, 2004, I had a verbal altercation with Davis. I've already been convicted of that. I was let out for an hour of recreation. During the hour, you are allowed to call your attorney or bondsman. They cut the phone off on me. I slammed the phone down. I told Davis

AO72A
(Rev. 8/82)

I had the right to use the phone. Davis told me to get on my knees. I told him I had back problems. They jumped on me and twisted my arms and kicked me.

When you are on your recreation hour, you can make as many calls as you want to family and friends. If you are on restriction, you can only call your attorney and bondsman. I was on restriction.

I spit at Davis. I told Davis he has to remember the people he is dealing with won't be locked up forever. I pled guilty to aggravated assault on an employee of a correctional facility.

On July 1, 2004, I was taken to court along with nine or ten other inmates. I was wearing a red and white jail uniform due to the incident with Davis. The red and white stripes indicate an inmate is a problem inmate or an escape risk.

There was a thirty day continuance. My lawyer asked that I be taken back to the ADC. Turner took it upon himself to tell the court that Lt. Hendrix wanted me held over because I had flooded my cell. Turner advised the court that Hendrix wanted me to do my punitive time. The Judge said to bring me back.

I told my lawyer that Turner lied. Hendrix didn't have a requirement like that.

When we got back to the BCDC, another inmate went to the bathroom. There were two deputies. Officer Flowers was in the intake area. Major Drake said no inmate is to use the bathroom or lean on the wall. I wasn't in the bathroom. I never used the restroom in intake. I know it is against the rules for inmates to lean against the walls.

I was talking to Turner about why he lied in court about telling the court to hold me over. Turner was mad because he had been reprimanded by Drake for allowing an inmate to use the bathroom. Turner started saying I was leaning against the wall and telling me to get off the wall.

-3-

I was two feet away.  I told him I wasn't on the wall.  Officer Flowers was there.  Turner told me to shut the f— up.

I said I didn't have to shut up.  I had the right to freedom of speech as long as I wasn't a threat to security.  I said: "F— you."

I had my glasses on at the time.  Turner jerked me out of line, slammed me against the wall, pushed me over a table, slammed me to the floor, and knocked my glasses off.  I said that was police brutality.  I hope you are smiling for the camera.  When I said that, Drake said let him up.

I got up and Turner picked my arms up high behind my back.  My right shoulder separated.  My left shoulder popped.  It got real hot.  I felt a bad pain.  It went all the way to the neck.  My left shoulder now pops in and out.  I never had problems with my left shoulder before this.

I was not handcuffed.  Turner put my hands together as if he were going to handcuff me.

I said you are breaking my shoulder.  Turner lifted my arms even higher and took me through to a holding cell.

I called Flowers.  I asked for a nurse.  Flowers called the nurse.  The nurse sent me to the emergency room.  The doctor said there was a complete dislocation.  He said the shoulder was completely separated.  I was given an immobilizer at the hospital and given Darvocet for pain.  I got nothing from Dr. Mullins.

I submitted a medical request regarding the incident with Turner on July 1st.  *Plaintiff's Exhibit* 3 at page 1 (Medical request dated 7/1/04–"Officer Turner twisted my arm up behind my back because he told me f---- you and I told him f— you back it's all on camera.  I did not resist

or nothing to be treated like this. This is police brutality."). I submitted a request on July 7th wanting to know where the responses were to my grievance about Turner's police brutality. *Plaintiff's Exhibit* 3 at page 3 ("I want to know where my responses are that I wrote a Grievance on Officer Turner for Police Brutality. I wrote on the 1st one on the 3rd and one on the 5th and I've yet to get a response."). I wrote separate grievances but never got responses.

I went back to the ADC two or three days later. When I was transported back to the ADC, Officer Holmes went out to the car and told them I was state property and the car could not leave until he had all the information he needed.

I was ordered to see an orthopedic specialist. Corrective surgery was scheduled. I still haven't had the corrective surgery. I went back to the BCDC and then kept me for ninety days so I didn't get to have the surgery.

I still have problems with my left shoulder today. If I raise it up and down, it gets numb. My left shoulder pops out and pulls on the neck muscles. Prior to the incident with Turner, I had never reported to the doctor problems with my left shoulder.

I was never diagnosed with problems to the right shoulder. I never had the right shoulder x-rayed. The right shoulder was visually examined before. I don't have the ability to pop my shoulder in and out of joint. I didn't tell inmate Crawford in April of 2004 that I popped my shoulder out to get out of work detail at the ADC. I had a specific one arm lifting restriction at the ADC. The restriction had to do with my right arm. I've never had to work at the ADC due to my mental health status.

I recall sending a two page letter to Captain Petray and others at the BCDC in 2006 regarding Turner. It was to let them know of an incident that occurred at the ADC. To enlighten

AO72A
(Rev. 8/82)

them to the fact that he did not know how to perform his duties as transport officer. He walked into the ADC with his gun instead of turning it into the tower.

I've been in one fight in the ADC. In a period of ten years, I've been busted down once or twice for fighting. I don't recall ever fighting with a guard at the ADC.

I got in a fight with Gomez. They had opened the cell doors and someone shut his door. He thought it was me. When the door opened again, he came out holding a pencil up. I defended myself. I didn't get disciplined. The other inmate did.

I have flooded my cell a couple of times. You have to do something to get them to move or they won't do anything for you.

### Clint Copp

I'm twenty years old. I'm presently incarcerated at the BCDC. I was incarcerated there on July 1, 2004.

I recall the incident between Turner and Savage. We had just returned from court. We were all in the intake area waiting to get our handcuffs and shackles off. Turner and Savage were talking. Turner said shut the f— up. Savage responded that he didn't need to shut the f— up.

Turner grabbed Savage's arm, pulled the right arm up and continued to force it up as he got the other arm up, slammed Savage against the wall, had his hands behind his back, and physically forced Savage to the floor with both hands behind his back.

I didn't see Savage do anything threatening. Initially there was about twenty feet between them.

Once Turner had Savage to the floor, Drake came through and told Turner to release Savage. We were taken into the booking area and Savage was put in the holding cell.

-6-

I haven't seen Savage since we were in jail. I didn't know why we were coming to court today. There was no legitimate reason for Turner to use force.

I recall Savage saying the rules allowed freedom of speech so long as the speech was not accompanied by the use of force. I don't recall who used the restroom. I know someone used it.

Savage was not leaning against the wall. Leaning was against the rules. It was against the rules to use that restroom.

I have seen the use of force by officers that I have agreed with. I've been to the ADC once. I've never been busted down.

On July 1, 2004, I was waiting to be released from shackles. I wasn't saying anything. They ordered us all to be quiet and stand away.

### James Misener

I'm twenty-seven years old. I'm an ADC inmate.

I was in the BCDC on July 1, 2004. I was in for a probation violation and sexual assault.

I recall some of the incident involving Turner and Savage. I recall coming back from court and we were getting our chains off. Turner told Savage the "F" word. Savage said it back. Turner shoved Savage up against the wall and then took him to the floor. Turner pulled Savage's arm up behind his back.

When they got Savage up, Turner put Savage's arms behind his back and pulled up. Savage said: "You are breaking my arm." Turner put Savage in a holding cell.

I was two people down from Savage in the line. I didn't see Savage do anything threatening.

Turner's use of force was in response to Savage's mouthing Turner back. But Savage wasn't mouthing very bad.

A couple of days after the incident, I had contact with Savage. I had no clue why I was coming here today until I was on the way. Savage told me today I was coming here because of the incident between him and Turner. I told him the same as I just told you. I just told him what I remembered. He didn't tell me what to say. I have never shared a cell with Savage. I've never testified in one of these proceedings.

Turner seemed like a pretty good old guy. He didn't seem angry.

I don't recall who Captain Drake was.

I know someone used the restroom. I don't know his name. We were just standing in line.

Flowers said something. I thought she was a major. She said something like let him up. I was waiting for my shackles to get off.

I didn't say anything. I figured they would jump on me. They told us to be quiet.

### Jason Rogers

I was not in the BCDC on July 1, 2004. I'm in the same unit as Savage. I didn't know him before today. I don't know what the case is about.

### Officer Audrey Flowers

I work for the Benton County Sheriff's Office as a field deputy now. In July of 2004, I worked in the jail. I was either a deputy or a corporal.

I recognize Savage from being an inmate in the BCDC. He was an inmate there for a very long time.

AO72A
(Rev. 8/82)

On July 1, 2004, I was in the intake area. I don't recall the incident between Savage and Turner.

I recall force being used against Savage several times when he flooded his cell. He has had to be restrained several times. Savage is disobedient, rude, and vulgar. He makes derogatory, obscene comments. Savage did it more than other inmates. For using vulgarities, I ignored him.

The most common form of disobedience by inmates is passing things, crossing the red line; just things like that the inmates knew broke the rules. Jailers are trained to never turn their backs on inmates in an open area. Red and white stripes mean an inmate is a flight risk or has a history of violence towards staff. The red and white stripes put a deputy on notice to be more cautious with inmates dressed this way.

If I'm having trouble with an inmate and it is an open area where they have access to me, I call for assistance. A level of continuum is used. First you use verbal commands. However, if an inmate comes at me, I'm going to respond. I'm going to restrain him. I will tell him to put his hands behind his back. If that doesn't work, I will put his hands behind his back for him. It is common to have to take an inmate to the floor or against the wall to gain control.

I would have written an incident report if I had witnessed what occurred between Savage and Turner. I heard Savage trying to rile up the other inmates.

We all met today regarding this case. We were told the types of questions that would be asked. I do not recall being called to Savage's cell and being asked for medical attention for his shoulder.

AO72A
(Rev. 8/82)

My signature on a request form merely means I took that piece of paper and placed in into the medical basket. Inmates wearing red and white stripes are housed with other inmates. As far as I recall, Savage complied with requests to be handcuffed except one time when he started to take the handcuffs apart.

### Major Gene Drake

I am the operations commander at the Benton County Sheriff's Office. I have been in this position for about three years. Before that I was the jail commander. I am second in command under the Sheriff as far as the jail facility.

On July 1, 2004, I was in the booking area at the jail. I had been touring the jail. I was in the central control area. You can view the intake room from there. A person in central control can monitor the entire jail.

When something happens in the intake area, the camera should be flipped to the intake area and set to record. When inmates come back from court, if the deputy in the central control sees something occurring, he should record the incident. Whether a tape is saved, is up to the shift sergeant.

I noticed Turner and another deputy in the intake area. I noticed Savage had gone into the restroom and come back out. The deputies did not notice this. The inmates were behind the deputies. The inmates were moving around in there on their own without instruction. The caution level should be raised when there are that many inmates any only two deputies.

The red and white stripes are used on inmates who are an escape danger or have a history of violence. Inmates are not allowed to move freely outside the cells. We have a no leaning rule.

-10-

It keeps the walls clean and shows that we have control. Inmates are to walk with their hands behind their backs. It establishes that we are running the jail and in control.

On July 1st, I also saw Savage leaning against the wall. Savage was the only inmate against the wall. The deputies had other handcuffed inmates that they needed to be giving attention to.

I didn't see that the deputies had a lot of control over the situation. I either spoke with Turner then or later about control. I know I came out and spoke to Turner and said we needed to get better control. I may have possibly went to the opening in the glass and spoke through it loudly.

Savage didn't get off the wall. I asked Turner to follow through. The next thing I knew Turner had Savage on the ground and was handcuffing him. I turned around just a few seconds. I turned back and Savage was on the ground. I may have told Turner to put Savage into holding. It is possible I could have told Turner to let Savage up. We needed to get all the inmates following the rules at the same time or you have a problem.

I didn't see the actual take down. Savage usually has his mouth running. The action was not taken because of that but instead because he was leaning on the wall.

I didn't have any conversation with the attorney regarding the kinds of questions that would be asked today.

### *Captain Hunter Petray*

I am the jail administrator for the BCDC. I have held this position since July of 2004.

I recall the incident on July 1st. I was in the booking area. Turner and another deputy

-11-

brought the inmates back from court. They were in the intake area. There were seven or eight inmates, maybe more.

Major Drake stepped into the intake area. I recall Drake telling Savage to get off the wall. Savage argued with the Major. Savage yelled he had freedom of speech over and over.

Turner said shut the f— up. Savage continued to talk. Turner went over and took Savage down and handcuffed him.

Our policy is not to use physical force because of verbal taunts. I don't think Turner acted out of line. There were seven or eight inmates. Savage was a known trouble maker. Savage was out there mouthing or yelling. Savage needed to be taken away or isolated.

Savage did get off the wall when Drake told him to. I don't recall seeing Savage with his fists clinched. Savage was standing out of line, he was alone, facing the Major.

I believe Savage was still handcuffed when he was leaning against the wall. I believe Savage was not cuffed when Turner subdued him but was put back into cuffs.

Turner walked over and approached Savage from the left side. Turner grabbed Savage's shoulder and took him to the floor. Turner handcuffed Savage, brought him up, and escorted him to a holding cell. Savage was yelling obscenities and that it was police brutality.

Savage didn't appear to be injured. He had no abrasions.

I talked to Jason Owens, our attorney, about my testimony. He told me to tell the truth.

Savage was yelling about freedom of speech etc. Rule 7 of the BCDC rules is that inmates have free speech as long as there is no threat to security.

-12-

There were seven or eight inmates. When you have one inmate who was verbally escalating, there is a chance the other inmates will get involved. Savage was verbally arguing with the Major.

You don't always give the inmate a verbal warning. Sometimes you just take the inmate down. I don't recall for sure whether Savage was handcuffed or not.

If someone in the control booth sees something going on, they can push the button to record the incident. There is no written policy about this. It is up to the deputy to charge you with a disciplinary. I assume Savage was already on lock-down. If inmates are written down for everything, a deputy would never get anything down.

A disciplinary can result in lock-down and privileges being taken away. An inmate is put in red stripes if they are violent. Savage was already on lock-down. He had been charged with a crime the day before and put in red stripes.

### Sue McDonald

I'm a nurse at the BCDC. I've been there for eight and one-half years.

I recall Savage. I recall him having problems with his right shoulder. As far as I know, he had the problems when he came into the jail. He has always complained about his shoulder.

When an inmate needs medical care, he requests a form, fills it out, the forms are picked up, and brought to me. I review the forms and decide if the inmate should see the doctor or the nurse.

We saw a lot of Savage. He had different minor things, colds, etc.

Savage saw Dr. Mullins on June 28, 2004. Savage had come to the BCDC for court and reported falling in the shower on Wednesday. *Defendant's Exhibit* 1 at page 1. Savage reported

-13-

being put on two weeks bed rest by the prison. *Id.* Dr. Mullins' notes indicate he believed Savage was exaggerating his symptoms and guarding, putting up resistance or not cooperating, during the examination. *Id.*

I don't normally see the ADC records. I have to take the inmates' word about their records.

We had Savage's shoulder x-rayed once. It was an old injury–from a previous accident or something.

On July 1, 2004, Savage asked for medical attention. He was sent to the emergency room for x-rays. I think they sent him to cover themselves. There was a complete dislocation of his shoulder. It came out of the socket. It could be caused by a use of force. It could just pop out from a previous injury.

Savage was seen by J. O'Dell on July 1st. She noted that he had a deformity of the right shoulder. *Defendant's Exhibit* 2. Savage complained of intense pain on movement. *Id.* Dr. Mullins was notified and Savage sent for an x-ray of his right shoulder. *Id.*

Savage complained of pain in his right shoulder again on July 6th and was seen by Dr. Mullins. *Defendant's Exhibit* 2.

### Scott Turner

I'm a transport deputy for the Benton County Sheriff's Office. I occupied the same position in July of 2004.

I left at 8:00 a.m. on that day with approximately ten inmates to go to Circuit Court. There was another deputy with me. I asked Savage several times to refrain from talking to anyone including other inmates.

-14-

I brought them back into the BCDC to line up against the wall.  I started left to right removing the shackles.

I noticed the Sheriff, Drake, Petray and multiple deputies were in the booking area.  I heard Drake say something to Savage.  I looked over and Savage was leaning on the wall.  I said Savage get off the wall.

I guess Savage had come out of the bathroom.  I didn't see it.  Drake walked into the intake area.  Drake told Savage to get off the wall.  Drake told all the inmates about the rules.

I considered Savage to be a threat.  He has a track record.  He was hot tempered.  You don't know if they have any diseases.

Savage was mouthing.  I had enough of him that day.  He would not be quiet.  I saw Savage bunch his fists and take a step back.  I didn't have control.  I knew what happened the day before.  I took Savage's shoulders, turned him,  and took him to the floor.  Savage went down easily.  He went down quick.

I think Drake said Turner get him out of there.  I didn't even handcuff Savage.  I just picked him up.  I put my hands under his arm pits and picked him up.  I wanted to get him away from there.  His mouth was always a problem.  I got him to the cell and left him there.  He was shouting vulgarities, banging, kicking the wall, etc.

I used caution when I approached Savage.  I heard what had happened the day before.  He clinched his fists.  He took just a small step.

Before Drake came into the intake area, I had told Savage to get off the wall.  I told Savage to move away.  Savage obeyed and was three or four feet from the other inmates.

AO72A
(Rev. 8/82)

When the brass is around you better be doing it by the books. Andy Lee was a rougher–don't take the inmates to the hospital--kind of sheriff. Sheriff Ferguson wants a less physical type of jail. Drake and Petray don't tolerate excessive force against the inmates.

I cussed at Savage. I told him to shut the f— up. I just had enough of dealing with him over the past year. Getting him to court that day. I had just had it up to here with him. Savage had to be defensive with Drake. Savage went on about his constitutional rights etc.

When I approached Savage, he got defensive. I approached Savage because he would not be quiet. He was going off about his constitutional rights. I just wanted him to be quiet. I wanted to remove him from the situation. I overreacted. I didn't use handcuffs. I had just had enough of him and wanted him out of my sight.

If I had followed strict protocol, I would have put Savage's face to the wall. Instead, I took him down.

Savage was absolutely riling up the other inmates. A riot could have happened. I recall being in maybe two altercations with inmates other than Savage.

I transported Savage to the BCDC in April of 2004. It was Savage, Wilson, and Crawford. During the transport, I heard Savage say something like I have ways of getting out of work. I have never been on the "hoe squad." He mentioned a lot of injuries including an injury to his shoulder. *Defendant's Exhibit* 3. He said he could manipulate old physical injuries to get out of work.

I don't think I ever did anything to Savage's right shoulder. He went down easily and came up easily. When I heard about the dislocated shoulder, I was shocked. I wondered if he had done it in the holding cell.

-16-

I didn't use more force than I should have. I was angry and I used abusive language. I just wanted to get Savage out of the room. I could have prolonged the situation. I could have handcuffed Savage there, called for assistance, etc. Instead, I just backed Savage up against the wall and moved him down to the floor. Savage did not do what we asked him to. When Drake left the intake area, Savage got louder and louder.

Once I had taken Savage to the holding cell, I went back to intake and continued my job. I just wanted Savage personally away from me that morning. I didn't have any other problems. *Defendant's Exhibit* 4 (Turner's incident report).

There are forty-two cameras in the jail. The cameras are used to monitor and can be periodically moved from one area to another. When a new arrestee is brought in, I understand the camera in the intake area is put on record. I heard they were going to review the tape from that day but then I head a tape was not made.

The entire incident with Savage to less than sixty seconds. This includes the time it took me to take him to the floor and then to the holding area.

### *Medical Records*

In November of 2003, the ADC records indicate Savage was placed on one arm duty (left arm), due to difficulty raising his right arm secondary to a shoulder deformity. *Plaintiff's Exhibit* 1 at pages 50 & 53.

On December 15, 2003, Savage's right shoulder was x-rayed at the Northwest Medical Center of Benton County. *Plaintiff's Exhibit* 2 at page 4. The x-rays showed a grade 3 separation of the acromioclavicular (AC) joint. *Id.* Note was made that the heterotopic bone projected over the inferior margin of the distal clavicle which raised the possibility that the

-17-

separation was old. *Id.* The diagnostic impression was listed as: "AC separation, possibly chronic." *Id.*

Savage was seen at the emergency room of the Northwest Medical Center of Benton County on July 1, 2004. *Plaintiff's Exhibit* 2 at page 6. An x-ray of his right shoulder showed a "complete dislocation of the acromioclavicular joint which by history is acute." *Id.* at page 12. Note was made that ossific of calcific densities project immediately inferior to the distal clavicle suggesting that there has been an old injury as well. *Id.* He was diagnosed with a third degree AC joint separation of the right shoulder. *Id.* at page 8. His right shoulder was placed in an immobilizer. *Id.* at pages 6 & 10. He was prescribed Darvocet and Ibuprofen and told to follow up with Dr. Mullins in five to seven days. *Id.* at page 11.

On July 6, 2004, Savage was seen by Dr. Neil Mullins. *Plaintiff's Exhibit* 4 at page 14. Dr. Mullins noted that Savage had been in an altercation and dislocated his right shoulder. *Id.* Savage's right shoulder was in a sling. *Id.* Dr. Mullins' diagnosis was a dislocated right shoulder. Dr. Mullins' plan was to ask the prison if they wanted Benton County to follow up by sending Savage to an orthopedic specialist or if the ADC wanted to wait until Savage was back at the ADC. *Id.* Dr. Mullins prescribed Darvocet and a blanket as needed for warmth. *Id.*

On July 9, 2004, Savage returned to the ADC. *Plaintiff's Exhibit* 1 at page 60. Savage was seen by Dr. Patricia Kelly. *Id.* Dr. Kelly noted that Savage's right shoulder was drooped and when he moved there appeared to be an obvious separation. *Id.* She concluded Savage would probably need to be referred to an orthopedic doctor, Dr. John Lytle. *Id.* She prescribed Tylenol with codeine. *Id.* Later that day, an appointment was set up for Savage to see Dr. Lytle on July 21st. *Id.* at page 59.

-18-

Savage was seen by Dr. John Lytle of the South Arkansas Orthopedic Center on July 21, 2004. Dr. Lytle's diagnostic impression was a: "Grade 3 AC separation of the right shoulder." *Plaintiff's Exhibit* 5 at page 13. Dr. Lytle noted that Savage was doing okay but would most likely require surgical intervention in the future. *Id.* However, Dr. Lytle did not feel it was an urgent situation. *Id.* Dr. Lytle recommended that Savage stay in the immobilizer for a minimum of three more weeks and continue to take Ibuprofen. *Id.* Dr. Lytle wanted to re-check Savage in four weeks and begin a program of rehabilitation. *Id.* With respect to work, Dr. Lytle indicated Savage should be on restricted duty with no use of his right hand. *Id.*

On August 1, 2004, Savage was seen by Dr. Lytle again. *Plaintiff's Exhibit* 5 at page 11. At this visit, Savage also complained of pain in his left shoulder stating that it felt "like it" was "coming out." *Id.* Upon examination of the left shoulder, Dr. Lytle found no clinical evidence of significant AC separation or abnormality. *Id.* However, Dr. Lytle concluded surgical repair of the right shoulder should be scheduled in the near future. *Id.*

Following, Savage's second visit to Dr. Lytle, on August 5, 2004, ADC medical staff ordered a new x-ray and gave orders that Savage should not have any use of his right hand. *Plaintiff's Exhibit* 1 at pages 58 and 72. Savage's work restriction to no duty requiring the use of his right hand was also extended through December 5, 2004. *Id.* at page 73.

## II. DISCUSSION

"The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that 'arise[] in the context of an arrest or investigatory stop of a free citizen,' while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." *Wilson v. Spain*,

AO72A
(Rev. 8/82)

209 F.3d 713 (8th Cir. 2000)(*citing Whitley v. Albers*, 475 U.S. 312, 318-322, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). In this case, Savage was serving a term of imprisonment when the incident at issue occurred. The Eighth Amendment will, therefore, be used to analyze his claim.

"The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result." *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002)(citations omitted). The Supreme Court has held that when "prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992).

"Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the 'core judicial inquiry' is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000) (*quoting Hudson*, 503 U.S. at 6-7). To make this determination, the court is to consider, among other things, the following factors: "the need for the application of physical force; the relationship between the need for physical force and the amount of force applied; and the extent of injury suffered by the inmate." *Jones*, 207 F.3d at 495 (citations omitted).

It has been said that "[n]ot every malevolent touch by a prison guard gives rise to a federal cause of action" because the "prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* (citations and internal quotation marks omitted). While "[s]erious or permanent injury is not required to make out an Eighth

-20-

Amendment claim, [s]ome actual injury must be shown." *Id.* (citations omitted). Additionally, the court considers "the extent of the pain inflicted in order to determine whether a constitutional deprivation has occurred." *Id.* (citations omitted).

In this case, Savage maintains Turner jerked him out of line, slammed him against the wall, pushed him over a table, slammed him into the floor, and knocked his glasses off. Savage then contends Turner jerked his arms up behind his back with such force that Turner caused permanent injury to Savage's shoulders. Savage's testimony regarding what occurred is supported in part by what other inmates, Copp and Misener testified to. Turner admits utilizing some amount of physical force to take Savage to the ground and escort him to a holding cell.

We find Savage has failed to establish that excessive force was used against him. First, it is undisputed that Savage refused to obey the orders of Turner, was arguing with Turner, and Savage's actions were interfering with Turner's ability to concentrate and control the other inmates present. While Savage may believe his refusal was justified, the undisputed testimony was that there were multiple inmates in the intake area and only two deputies at the time. Turner testified he had been having problems throughout the day getting Savage to quiet down, to obey orders, and to follow the rules of the facility.

In this regard, the court finds Turner's testimony to be forthright and credible. While we believe, as Turner admitted, he was angry with Savage, we do not believe this anger translated into the use of excessive physical force. Instead, we believe Turner justifiably believed Savage needed to be controlled and removed from the intake area.

Savage by his own testimony was attempting to confront Turner about his alleged lie to the court regarding Savage. The court credits the testimony of Turner, Drake, and Petray that

-21-

Savage's conduct was a threat to the safety and security of the facility. Given Savage's repeated refusals to obey Turner's orders, Savage's refusal to obey Drake, and his repeated efforts to confront Turner about the alleged lie in court, we believe the use of some force to gain control of Savage was reasonable. *Cf. Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990)(When an arrestee flees or resists, some use of force by the police is reasonable).

Second, Savage testified Turner jerked him out of line, slammed him into a wall, pushed him over a table, and slammed him to the floor. Savage asserted the blows were forceful and amounted to police brutality. Despite this, Savage had no marks, lacerations, or other visible injuries.

While Savage did suffer an injury or re-injury to his right shoulder, the mere fact of the injury does not suggest that excessive physical force was used by Turner. The injuries could have occurred in any number of ways including being caused by Savage's own conduct either before or after the use of force by Turner. Additionally, records establish Savage had a prior AC separation injury to his right shoulder which may very well have predisposed him to injury.

In *Rodriquez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002), the court dealt with a situation in which the plaintiff maintained excessive force was used during his arrest. *Id.* at 1351. As summarized by the court: "The evidence, viewed in the light most favorable to plaintiff, shows Sgt. Farrell grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that Farrell was hurting him. Plaintiff was placed in the rear of Sgt. Farrell's patrol car, kept handcuffed behind his back and transported to the police station." *Id.*

AO72A
(Rev. 8/82)

The handcuffing caused the loosening of internal surgical hardware and the displacement of a key bone fragment. *Id.* "[R]esulting complications included more than twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow." *Id.*

The court stated that:

> Rodriguez's earlier surgery made what otherwise would be a common non-excessive handcuffing technique (that ordinarily would be painful but cause minimal injury) a maneuver that caused severe injury and tragic results. This distinction, however, is not important legally and does not preclude a conclusion that Rodriguez has shown no constitutional violation: no evidence has been presented that Sgt. Farrell knew of plaintiff's recent elbow surgery or, more important, knew that handcuffing plaintiff would seriously aggravate plaintiff's preexisting condition. We do not use hindsight to judge the acts of police officers; we look at what they knew (or reasonably should have known) at the time of the act. What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time. Under the circumstances of this case, Sgt. Farrell's acts cannot rise to the level of a constitutional violation.

*Id.* at 1352-1353 (citation and footnotes omitted).

We believe similar reasoning applies in this case. While Turner did use some force to remove Savage from the intake room, the testimony simply does not establish that Turner used excessive force under the circumstances or that Turner was aware that Savage's prior right shoulder injury pre-disposed him to more severe injury.

Moreover, at the evidentiary hearing, Savage testified he did have a prior injury to his right shoulder but that Turner's actions also caused injury to his left shoulder. None of the medical records establish that Savage suffered any injury to his left shoulder. In fact, the only time Savage mentions an injury to his left shoulder was in connection with his second visit with Dr. Lytle. Upon examination, Dr. Lytle noted he could ascertain no injury to Savage's left shoulder. In sum, we believe there is insufficient evidence to establish that the use of force was

-23-

in excess of that reasonably believed to be necessary in the interests of safety, security, or efficiency.

### III.  CONCLUSION

I therefore recommend that judgment be entered in the defendant's favor and this case be dismissed with prejudice.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of November 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

-24-