### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

BOBBY WAYNE SAVAGE                                        PLAINTIFF

        v.          Civil No. 05-5037

OFFICER SCOTT TURNER                                      DEFENDANT

### O R D E R

Now on this 17th day of May, 2007, comes on for consideration the **Report And Recommendation Of The Magistrate Judge** ("R&R")(document #62), and plaintiff's **Objections** thereto (document #66).

1.   In this suit brought pursuant to **42 U.S.C. §1983**, plaintiff Bobby Wayne Savage ("Savage") contends that an employee of the Benton County Sheriff's Department, defendant Scott Turner ("Turner"), used excessive force on him in an incident that took place at the Benton County Detention Center ("BCDC") on July 1, 2004.

2.   The matter was referred to U.S. Magistrate Judge Beverly Stites Jones for a report and recommendation to this Court.  The Magistrate Judge conducted an evidentiary hearing, upon which the R&R is based, and recommended that judgment be entered in favor of Turner on Savage's claim.  This recommendation was based on her finding that Savage refused to obey Turner's orders, argued with Turner, and interfered with Turner's ability to concentrate and control other inmates.  She found that Savage's behavior "was a threat to the safety and security of the facility," and that

"Turner justifiably believed Savage needed to be controlled and removed from the intake area."

The Magistrate Judge also found that the amount of force used was not excessive because Savage "had no marks, lacerations, or other visible injuries," his previous shoulder dislocation could have "predisposed him to injury," and the injury to his right shoulder "could have occurred in any number of ways including being caused by Savage's own conduct either before or after the use of force by Turner."

3.   Savage timely filed a lengthy and somewhat rambling document encompassing a variety of objections to the R&R and the Court will address those objections in due course.

Because Savage's objections call into question certain aspects of the testimony taken before the Magistrate Judge, the Court has reviewed the audio tapes of the hearing and, based upon that review, finds the evidence relevant to Savage's complaint to be as follows:

    *    On July 1, 2004, Savage was one of a group of inmates (testimony places the number in the group at between 7 and 10) in the intake area of the Benton County Detention Center ("BCDC")[1].  The group was returning from state court.  They had been brought in to the

---

[1]At the time, Savage was an inmate at the Arkansas Department of Corrections ("ADC") on a parole violation, but had been transported to the Benton County Detention Center ("BCDC") for a court appearance on another matter.

intake area of the BCDC wearing handcuffs and shackles, and were being guarded and unshackled/unhandcuffed by two deputies -- one of whom was defendant Turner[2].

* Savage was wearing a red and white striped jail uniform -- which indicates that an inmate presents a risk of flight or violence -- because the day before he had been in an altercation with a guard.  He had spit at the guard in that incident.

* Savage was angry at Turner because of something that had allegedly occurred during his court appearance. Turner considered Savage to be hot-tempered and a threat, based on his history.

* A confrontation occurred between Savage and Turner during the process of having shackles and handcuffs removed from the prisoners who had just been transported -- at a point after Savage had been released from his handcuffs and shackles.  All the witnesses testified to roughly the same scenario:  the two men argued about whether Savage had been leaning against the wall[3], the verbal exchange escalated, eventually Turner told Savage to "shut the fuck up," whereupon Savage replied "fuck you."  Turner then physically took Savage down to the

---

[2]The other deputy is not clearly identified in the testimony, but is alleged to be Officer Conners in Savage's Complaint.

[3]It is against BCDC regulations for inmates to lean against the wall.

-3-

floor, picked him back up, and took him to a cell.

* While the witnesses agree on these general contours of the situation, they differ with respect to what might have motivated Turner to take Savage down:

^ **Savage's Version:** Savage testified that when the verbal exchange reached the point of cursing, Turner jerked him out of line, slammed him against the wall, and slammed him to the floor, knocking his glasses off. When Savage started saying that he was being subjected to police brutality, Major Drake told Turner to let Savage up. While it is not clear from Savage's testimony how he got off the floor, it appears from the Complaint that he stood up on his own. Then, thinking Turner was going to handcuff him, he put his hands behind his back. Turner took his wrists and pushed his arms up behind his back. When he complained about Turner "breaking his arms," Turner pushed his arms up higher, and Savage felt sharp pain in his right shoulder. According to Savage, there was no provocation for the take-down except for his words.

^ **Turner's Version:** Turner testified that he was removing shackles and handcuffs from the several prisoners, and that Savage was the first to be released. At some point, he heard Major Drake (the operations

-4-

commander, who was in the booking area and could see the intake area through a window) say something to Savage. He looked at Savage and saw him leaning on the wall. Turner told Savage to get off the wall, and to "move away." Savage moved away from the wall and away from the other inmates, by 3-4 feet. Drake then came into the intake area, and told Savage to get off the wall. Drake went back into the booking area, and Savage started arguing with Turner, saying that he was not on the wall. Turner eventually told Savage to "shut the fuck up," and Savage responded in kind. Savage clenched his fists and took a small step back "in a defensive manner," and, because of the incident the previous day, Turner was cautious. He took Savage by the shoulders and pushed him away, turned him, and took him to the floor. Savage did not resist. He was being cooperative at that point. Then Drake[4] told Turner to get Savage "out of there." Turner grabbed Savage by his wrists or hands with one hand, and put the other under Savage's left armpit, and "with all that adrenaline, I just picked him up" and took him to a cell. Turner admitted that Savage had the right to respond to his use of cursewords with cursewords of his own, and that he --

---

[4]Turner was not positive it was Drake who said this, but was positive that someone in authority said it.

Turner -- overreacted to the situation. He said he was tired of dealing with Savage, with his loud and abusive language, his verbal defensiveness, his "going off on his constitutional rights and his freedom of speech." He admitted that he was angry, that he "had had enough of" Savage, and that he just wanted to "make him be quiet." He said "I just wanted to get him away from me" because of his "mouth." Turner admitted that what he should have done -- if he had followed strict protocol -- was just tell Savage to turn around and face the wall and be quiet. Although Turner testified that "a riot could have happened," he also testified that there were only "maybe 3-4 inmates unshackled" when the incident occurred, and that in addition to himself and the other transport deputy in the intake area, Drake, Captain Hunter Petray (the jail administrator), and the Sheriff were in the immediately adjacent booking area.

^  **Drake's Version:**  Major Gene Drake, operations commander, testified that he was in the booking area, which had windows into the intake area, when he noticed that Turner and another deputy had a group of inmates in the intake area.  He said he saw Savage go into the restroom, but the deputies did not notice, and that he went into the intake area and spoke to Savage, telling

him not to use the restroom without asking a deputy, and telling him to stop leaning on the wall.  Drake then asked Turner to get Savage off the wall, because Savage had not moved off the wall when he, Drake, told him to. The next thing Drake knew, Turner had Savage down and was putting handcuffs on him.  Drake then left, and could not recall how Savage got up off the floor.  Drake testified that Savage "usually has his mouth running," but admitted that it was not permissible to use force for that reason alone.  His testimony was that force was used because Savage refused to get off the wall.  Drake testified that he was concerned about the way the deputies were handling the unshackling process, because inmates were behind the deputies and the deputies were outnumbered 5-1, a situation which raised safety concerns.  Drake did not recall seeing any clenched fists or threatening posture on the part of Savage.

^  **Petray's Version:**  Captain Hunter Petray, jail administrator, testified that he was in the booking area when the inmate group returned from court. He said that he heard Drake tell Savage to quit leaning on the wall, and that Savage got off the wall when Drake told him to, but that Savage started arguing, saying he wasn't leaning on the wall, and stepped out of line, yelling

-7-

about freedom of speech.  He recalled Turner telling
Savage to "shut the 'f' up." He did not recall seeing
Savage with clenched fists.  When Savage continued to
talk, Turner walked over, took hold of Savage, "placed
him on the floor," handcuffed him[5], picked him up, and
took him to a holding cell.  He testified that according
to jail policy, an officer was not supposed to use force
in response to verbal taunts or cursing from an inmate,
but that in a situation where an inmate was verbally
escalating, there was "the potential for other inmates
to get involved." There were, however, no problems with
other inmates in the group.  He testified that he would
have handled the situation the same way Turner did:
take him down, restrain him, escort him, isolate him.

^  **Other Inmates' Versions**:  Two other inmates in the
transport group testified.  Clint Copp testified that he
did not see Savage make a fist, do anything menacing or
threatening, or do anything that would have warranted
Turner in taking Savage down. James Misener testified
that Turner "told Savage the f-word and Savage told it
back to him," and then Turner shoved Savage against the
wall and then down to the floor.  Then Officer Flowers
came in, said something about "letting him up," and

---

[5]Later in his testimony, Petray waffled on whether Turner handcuffed Savage before
picking him up.

Savage got up and Turner pulled his arms up behind his back.  He did not see Savage do anything threatening toward Turner.  He recalled that Savage was "just standing there in line," and it was when Savage used the f-word that Turner took action.

^   **Officer Audrey Flowers** testified that she had no recollection of the incident.  She did, however, confirm that the general rule, when an inmate used vulgarities, was to ignore it.  She also recalled Savage as a disobedient and rude inmate, who was always "crossing the red line."  She testified, hypothetically, that if she were in an open area with ten inmates and only one other deputy, and one of the inmates assumed a fighting posture with fists clenched, she would tell him to put his hands behind his back, and if that did not work, she would put his hands behind his back for him, then secure him with handcuffs.

*   After the incident, Savage asked Officer Flowers to call the nurse.  He was sent to the hospital, where his right shoulder was x-rayed.  The x-rays revealed a "complete dislocation of the acromioclavicular[6] joint which by history is acute.  Ossific or calcific densities project immediately inferior to the distal clavicle suggesting

---

[6]The articulation between the clavicle (collarbone) and the acromion of the scapula (shoulder blade).  Stedman's Medical Dictionary, 28th Ed.

that there has been an old injury as well."[7]   The physician diagnosed a grade 3 separation of the acromioclavicular joint.   Savage's right shoulder was placed in a shoulder immobilizer and he was prescribed twenty Darvocet[8] plus a seven-day course of three Ibuprofen[9] 800mg daily.

* On July 6, 2004, Dr. Neil Mullins saw Savage.   Dr. Mullins continued Savage's prescription for Darvocet, up to three a day, for pain.   Dr. Mullins also noted that he would contact ADC to determine "if they want us to follow up here by sending him to an orthopedic specialist or wait until he gets back to prison as he is only up here to testify in trial."

* Savage was returned to ADC, where he was seen on July 9, 2004, by Dr. Patricia Kelly, who noted that Savage's "shoulder is drooped and when he moves it the least ther[e] is an obvious sepreation [sic]."   Dr. Kelly prescribed a five-day course of Tylenol with codeine[10],

---

[7]Savage had previously dislocated his right shoulder.   In an ADC health exam dated November 20, 2003, it was noted that he had a history of a "dislocated clavicle," and that he had difficulty raising his right arm secondary to a "shoulder deformity."   He was restricted to duty using only his left arm.   On December 15, 2003, he was diagnosed with a grade 3 separation of the acromioclavicular joint, and the diagnosing physician believed this to be potentially a chronic problem.

[8]Used to treat mild to moderate pain.   Physician's Desk Reference, 1995 Ed.

[9]Also used to treat mild to moderate pain.   Physician's Desk Reference, 1995 Ed.

[10]Used to treat mild to moderately severe pain.   Physician's Desk Reference, 1995 Ed.

-10-

six tablets daily, and arranged for Savage to see an
orthopedic specialist, Dr. John Lytle.

* Savage saw Dr. Lytle on July 21, 2004.  Dr. Lytle noted
a grade 3 acromioclavicular separation, which was "very
mobile," and that Savage could "reduce" it or "flex his
arm and shoulder" and cause it "to be displaced again
severely."  Dr. Lytle noted that Savage "most likely
will require surgical intervention," but thought it best
to "allow it a chance for it to try and heal itself and
become non-tender and review it's function."  He
continued use of the immobilizer and twice daily
Ibuprofen for three weeks, and directed that Savage
return in four weeks.

* A note from Connie Hubbard, a nurse at ADC, indicated
that Savage was to have "[n]o duty requiring use of
right hand or arm from 8-5-04 thorugh [sic] 12-5-04."
However, he had been under a similar restriction before
the incident with Turner.

* Savage again saw Dr. Lytle on September 1, 2004, at
which time it appears that Savage had not responded well
to the conservative treatment regimen.  In addition,
Savage was complaining of pain in his left shoulder,
saying "it feels like it is coming out."  Dr. Lytle
found "no clinical evidence of significant AC separation

-11-

or abnormality" of the left shoulder.  He recommended surgical repair of the right shoulder, noting that Savage "will never have complete pain relief but he should have much better function and ability to tolerate the use of his shoulder."

\*    Savage has not had corrective surgery to his shoulder.

4.    Because Savage had already been convicted at the time of the conduct in question, his excessive force claim is analyzed under the Eighth Amendment.  **Whitley v. Albers**, **475 U.S. 312 (1986)**.  The applicable law is set forth in **Treats v. Morgan**, **308 F.3d 868 (8th Cir. 2002)**[11]:

\*    The Eighth Amendment protects inmates from "the unnecessary and wanton infliction of pain by correctional officers regardless of whether an inmate suffers serious injury as a result."

\*    "Officers are permitted to use force reasonably in a good-faith effort to maintain or restore discipline, but force is not to be used maliciously and sadistically to cause harm."

\*    "Factors to be considered in deciding whether a particular use of force was reasonable are whether there was an objective need for force, the relationship between any such need and the amount of force used, the threat reasonably perceived by

---

[11]Internal citations and quotation marks have been deleted from the quotations to Treats.

the correctional officers, any efforts by the officers to temper the severity of their forceful response, and the extent of the inmate's injury."

5.   As previously noted, Savage submitted a variety of objections to the R&R which the Court has grouped for convenience into the categories addressed below.

6.   Savage objects that the BCDC witnesses are not credible. He points out that there are inconsistencies between their various accounts of the incident;  that they have what he perceives as a motivation to lie ("they are all prejudice [sic] against me trying to protect there [sic] job and to help Officer Turner");  that Turner did not like him; and that the witnesses had been "prepped" by their lawyer before the hearing whereas he had no lawyer to represent him.

The Court finds no merit in these objections. Witness preparation, motivation, and attitude exist in every case, and are taken into consideration by the trier of fact in evaluating credibility.  They are simply a fact of litigation.

7.   Savage objects that the fact of his injury is -- in and of itself -- evidence of unreasonable force.  He states that his shoulder had never separated until the incident, and that he could not have done this to himself.  This argument is clearly lacking in merit, given the medical history of a grade 3 separation of Savage's right shoulder in December, 2003.

8.  Savage objects to the Magistrate Judge's refusal to subpoena two witnesses who allegedly could have testified to events that occurred between himself and Turner while they were in court earlier on the day of the incident.  These events, Savage maintains, would show a basis for Turner's anger at Savage, and would have impugned Turner's credibility.

This argument is without merit.  Turner admitted that he was angry at Savage, that he failed to follow policy, and that he overreacted.  Savage fails to show how the missing witnesses would have added anything to this picture.

9.  Savage contends that the Magistrate Judge "lied" and "clearly trys [sic] to hender [sic] me and favors the defendants due to these prejudices."  There is absolutely no evidence to support this contention, and the Court rejects it out of hand. Magistrate Judge Beverly Stites Jones (now retired) served the federal judiciary honorably for many years, and the Court has reviewed hundreds of reports and recommendations she prepared. While the Court has not always adopted those reports and recommendations *in toto*, it has never perceived any favoritism or prejudice in any of them -- nor does it perceive such in this case.  Magistrate Judge Jones directed the questioning of the witnesses on Savage's behalf so as to draw out facts relevant to his claim; allowed Savage to supplement her questioning; and developed the documentary record.  All of this allowed Savage,

acting *pro se*, to present a clear evidentiary picture of the facts relevant to his claim.

10.   Savage objects to the Court's ruling denying him a transcript of the hearing in this matter, saying that he cannot "remember all aspects of the hearing." This objection is without merit, given that the Court has reviewed the tape recordings of the hearing for evidence bearing on all the issues before it, both that favorable to Savage and that favorable to Turner.

11.   Savage objects that the force used against him was unreasonable because it is not the policy of BCDC to use physical force of any kind to respond to verbal taunts. This objection calls for an analysis of the factors identified in **Treats**, as follows:

(a)  Was there an objective need for force?

In light of the BCDC policy not to use physical force to respond to verbal taunts, in order to demonstrate "objective need" for the force used against Savage there must be shown some evidence of conduct or action by Savage other than the words he used.

Turner testified that Savage clenched his fists and took a defensive posture -- but neither the other officers in the immediate area nor the inmates observed this. It is interesting to note Turner's characterization of Savage's posture as being "defensive" -- as opposed to, for example, "aggressive" or

-15-

"threatening."   Beyond that, however, Turner was unequivocal in his testimony that he took the actions he took because he wanted Savage to be quiet.

Turner also testified that "a riot could have happened." Based upon its review of the record, the Court is not persuaded there is any basis to support such an opinion on the circumstances shown.  There is no evidence to suggest that the other prisoners present were sympathetic to or supportive of Savage in his confrontation with Turner and it appears that only three of four of them were out of handcuffs and shackles at the time.  Moreover, in addition to Turner and the other transport deputy who were present in the intake area, Drake, Petray and the Sheriff were in the immediately adjacent booking area.  In addition, according to Savage, the injury occurred when Turner lifted Savage's arms up high behind his back -- after he was up off the floor and at a point where Turner conceded that Savage was being cooperative.

Drake testified that force was used because Savage refused to get off the wall when told to do so -- but both Petray and Turner testified that Savage did move away from the wall when told to do so.  Drake also testified that the deputies were outnumbered five to one thus amounting to a situation which raised safety concerns. Such concerns cannot, of course, be wholly discounted but, given that most of the inmates were handcuffed and shackled; that nothing more than talk between Savage and Turner had occurred

-16-

before the "takedown"; and that senior jail officials could and did observe the situation from close at hand, these concerns would not, in the Court's view, reasonably support a "takedown" not otherwise appropriate.  This same observation is applicable to the testimony of Petray that there was "the potential for other inmates to get involved."

In sum, the Court concludes that the evidence shown does not support a finding of objective need for the use of force.  "The law recognizes that order and discipline are important in running a correctional institution, but that does not . . . justify punitive use of force on difficult inmates not posing a real threat to other persons or raising security concerns." **Treats**, **308 F.3d at 872.**

(b)  What was the relationship between any such need and the amount of force used?

To the extent that Turner perceived a need to remove Savage from the company of the other inmates, there is no indication that he could not have done so by simply taking Savage to a cell, without first "taking him down."  Even if Turner had felt a need to handcuff Savage, there is no indication of any reason to take Savage to the floor before doing so.  Thus, to the extent that Turner may have subjectively perceived a need to take some action against Savage, the action he took involved more force than was reasonably necessary.

-17-

(c) Was there a threat reasonably perceived by the correctional officers?

As noted above, in connection with subparagraph (a), the Court does not believe that the possible "threat" suggested by Turner, Drake, and Petray was, in fact, a real one which was reasonably perceived -- given that most of the prisoners in the transport group were in handcuffs and shackles; the group was inside the jail walls; there were at least three other officers in an immediately adjacent area; and the conduct allegedly creating the "threat" was merely verbal taunts.  The Court is not unmindful of the fact that Savage had a history of fighting, and was identified by his red and white striped uniform as an inmate who posed a risk of flight or violence.  However, under the circumstances here shown, the Court does not believe that history -- without more -- would amount to a reasonable justification to believe he posed a threat to Turner or to others at the time in question.

(d) What efforts were used by the officers to temper the severity of their forceful response?

There is no evidence that Turner issued any verbal warning to Savage about the possible consequences of not being quiet.  Turner admits he overreacted, and that he failed to follow BCDC policy in handling the incident with Savage. Officer Flowers, testifying hypothetically, stated that if she and one other deputy were

-18-

confronted with ten inmates -- one of whom assumed a fighting posture with clenched fists -- she would tell that inmate to put his hands behind his back, and if that did not work, she would put his hands behind his back for him.  It thus appears that there were no efforts made by Turner to temper the severity of his forceful response, although there were reasonable means available to Turner for that purpose.

(e)  What was the extent of the inmate's injury?

Savage's right shoulder was dislocated in the incident.  His medical care providers found that he needed prescription pain medication, and Dr. Lytle believed that he needed corrective surgery.  He did not expect such surgery to bring about complete pain relief, but did expect that it would give Savage "much better function and ability to tolerate the use of his shoulder."

The fact that Savage had a pre-existing shoulder deformity, and had suffered a dislocation on several occasions, does not relieve Turner of legal responsibility for Savage's injuries. Savage was not taking pain medication for his shoulder when he arrived at the BCDC, nor was he under a medical recommendation to have surgical repair of his shoulder.  After the incident, both these situations obtained, leading to the conclusion that Savage suffered some injury as a result of Turner's actions, and that it was more than *de minimis*.  As the Supreme Court has noted, "[w]hen prison officials maliciously and sadistically use force to cause

-19-

harm, contemporary standards of decency always are violated.  This is true whether or not significant injury is evident." **Hudson v. McMillam**, **503 U.S. 1, 9 (1992).**

When the Court considers all the evidence in light of **Treats**, it concludes that Savage is correct in his assertion that physical force was used against him solely because of his verbal conduct, and that such force caused injury to his shoulder that was more than *de minimis*.  Because such use of force was against jail policy and was not otherwise necessary or appropriate under the circumstances, it was excessive and violated the Eighth Amendment.

12.  Having concluded that Savage was subjected to excessive force, the Court turns to the issue of damages.  In his Complaint, Savage stated "I want to be compensated for my injuries pain and suffering and all medical bills in the futhure [sic] and punitive damages."

(a)  Compensatory Damages:

While the Court finds that Savage sustained injury to his shoulder in the incident with Turner, the extent of those injuries is not entirely clear.  Savage had had a dislocated shoulder on at least two previous occasions, and his medical records indicated a "shoulder deformity." It is thus clear that he had lived with some degree of shoulder impairment before the incident. He arrived at BCDC under an activity restriction to duty using only his left arm, and went from that status to having the right arm in a sling

-20-

for some period of time.  The medications he was prescribed are used to treat mild to moderate pain, indicating that in the doctor's medical judgment, Savage was experiencing pain, but not severe pain.  While surgery was recommended in September, 2004, Savage had not had the surgery when evidence was taken in October, 2006.  There was no evidence regarding treatment, medication, or restriction on usage of the right arm beyond December 5, 2004.

When all of the foregoing is considered, the Court concludes that, while Savage suffered more than a *de minimis* injury, he was not severely injured by Turner.  The Court further concludes that an award of $500.00 will fairly and adequately compensate Savage for his pain and suffering during the five-month period for which there is evidence of a need for medical attention.

(b)  Punitive Damages:

In **Smith v. Wade**, **461 U.S. 30, 51 (1983)**, the Supreme Court held that "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law" triggers "consideration of the appropriateness of punitive damages."  The evidence here shows that Savage was loudly proclaiming his right to freedom of speech, and that Turner was tired of Savage "going off on his constitutional rights and his freedom of speech," and wanted to make Savage be quiet.  The evidence also shows that the BCDC had a written policy against the use of force to respond to verbal taunts and cursing from an inmate, yet that was precisely

-21-

what motivated Turner to use force.

Given this testimony, the Court concludes that punitive damages are appropriate in this case.  Turner disregarded both Savage's Eighth Amendment right to be free from cruel and unusual punishment (by taking him down, then hiking his arms up behind him hard enough to dislocate his shoulder) and his First Amendment right to free speech, embodied in the BCDC rule.  The Court concludes that a punitive damage award of $1,000.00 is appropriate.

13.  In his Answer to the Complaint, Turner asserted ten affirmative defenses.  Two of these assert offset (i.e., that "[a]ny amount sought by the Plaintiff should be offset by the amount owed by the Plaintiff to the County pursuant to A.C.A. §12-41-505[12]" and "by virtue of any criminal fines assessed against Plaintiff") and call for the Court to specifically address an issue which was not addressed in the R&R -- that of the capacity in which Turner was sued.

As explained in **Kentucky v. Graham, 473 U.S. 159 (1985)**, a government official may be sued in either his personal capacity or his official capacity.  "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast,

---

[12]This statute provides that a person lawfully committed to a county jail "shall pay the expenses in carrying him or her to jail and also for his or her support from the day of his or her initial incarceration for the who time he or she remains there."

'generally represent only another way of pleading an action against an entity of which an officer is an agent'." **473 U.S. at 165** (internal citations omitted).

In order to sue a government official in his personal capacity, the Eighth Circuit has held that "a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." **Johnson v. Outboard Marine Corp.**, **172 F.3d 531 (8th Cir. 1999).** The reason for the rule is "that only an express statement that they are being sued in their individual capacity will suffice to give proper notice to the defendants." *Id.*

A review of the pleadings reflects that Savage did not "expressly and unambiguously" state that he was suing Turner in his individual capacity. Notwithstanding that defect, the Court finds that the general rule does not mandate a finding that the suit is an official capacity claim. The pleadings of a *pro se* litigant are read broadly, and should be "construed to encompass any allegation stating federal relief." **Bracken v. Dormire**, **247 F.3d 699 (8th Cir. 2001),** citing **White v. Wyrick**, **530 F.2d 818 (8th Cir. 1976).** Savage's pleadings can be construed to encompass an allegation that Turner, in his individual capacity, violated Savage's Eighth Amendment rights.

In addition, Turner moved for summary judgment on the issue

-23-

of qualified immunity, a defense available only to an individual defendant sued in his personal capacity. **Kentucky v. Graham**, **_supra_**, **473 U.S. at 166-67**. It is, thus, clear that Turner was aware that he faced a claim of liability in his personal capacity.

It is a maxim of the law that when the reasons for a rule no longer exist, the rule ceases to be applicable. See **Zadvydas v. Davis**, **533 U.S. 678, 699 (2001)**, citing the maxim "_Cesssante ratione legis cessat ipse lex_", i.e., "the rationale of a legal rule no longer being applicable, that rule itself no longer applies." Here, Turner was aware that he faced a personal capacity claim, and the Court finds no impediment to the entry of judgment against Turner in his personal capacity. It is on that claim -- rather than an official capacity claim -- that the Court's award of damages in this case rests.

The foregoing analysis is relevant to Turner's pleaded defenses of offset, because Turner, in his individual capacity, has no standing to assert such defenses. Recoupment is the prerogative of the county, and the Court will leave the matter to the county to address under its usual procedures.

Turner's other asserted affirmative defenses are also without merit. Four of these defenses (punitive damages immunity[13],

---

[13]See, e.g., <u>Kirk v. Erickson</u>, 989 F.2d 505 (8th Cir. 1993)(unpublished), citing <u>Shabazz v. Coughlin</u>, 852 F.2d 697 (2nd Cir. 1988).

statutory tort immunity[14], sovereign immunity, and mootness of injunctive relief) are relevant to official capacity claims rather than personal capacity claims, and therefore afford no protection from personal liability.  Two (justification and failure to state a claim) are eliminated by the Court's substantive rulings herein. The statute of limitations defense is inapplicable because the Complaint was filed on March 7, 2005, less than one year after the incident[15].  The defense of qualified immunity was rejected by the Court's Order of June 29, 2006, adopting the R&R of the Magistrate Judge on that issue.

IT IS THEREFORE ORDERED that the **Report And Recommendation Of The Magistrate Judge** is **not adopted.**

IT IS FURTHER ORDERED that, for the reasons stated in this Order, plaintiff Bobby Wayne Savage's claim is found to have merit, and he is awarded Five Hundred and no/100 Dollars ($500.00) in compensatory damages and $1,000.00 in punitive damages against defendant Scott Turner.

IT IS SO ORDERED.

                                         **/s/ Jimm Larry Hendren**
                                         **JIMM LARRY HENDREN**
                                         **UNITED STATES DISTRICT JUDGE**

---

[14]See, e.g., <u>Simons v. Marshall</u>, --- Ark. ---, --- S.W.3d ---, 2007 WL 1219739 (2007).

[15]Arkansas' three-year statute of limitations applies to §1983 actions filed in Arkansas that allege a physical injury.  <u>Williams v. Bradshaw</u>, 459 F.3d 846 (8th Cir. 2006).